**JL, through her next friend, Bruce Thompson, Esq., et al., Plaintiffs,**

v.

**NEW MEXICO DEPARTMENT OF HEALTH, et al., Defendants.**

**No. 12–CV–1145 MV/LAM**

United States District Court,
D. New Mexico.

Signed March 4, 2016

Charles Robert Peifer, Robert E. Hanson, Peifer, Hanson & Mullins, PA, John Ford ·Hall, Kelly K. Waterfall, Peter Cubra, Law Office of Peter Cubra, Nancy L. Simmons, Law Offices of Nancy L. Simmons PC, Rachel E. Higgins, Rachel E. Higgins Attorney at Law, Zachary A. Ives, Garcia Ives Nowara, Albuquerque, NM, for Plaintiffs.

Jerry A. Walz, Walz and Associates, John K. Ziegler, Robert Conklin, Robin A. Goble, Sean E. Garrett, Conklin, Woodcock and Zigler PC, Albuquerque, NM, for Defendants.

## MEMORANDUM OPINION AND ORDER

MARTHA VÁZQUEZ, UNITED STATES DISTRICT JUDGE

THIS MATTER comes before the Court on Plaintiffs JL and KC's Motion for Partial Summary Judgment Against Individual Defendants[1] on Count I (Fourteenth Amendment Procedural Due Process Clause) and Against Department of Health Defendants[2] on Counts XVI and XVII, and Supporting Memorandum ("Motion for Partial Summary Judgment"). [Doc. 211]. The Court, having considered the motion, briefs, and relevant law, and being otherwise fully informed, finds that the Motion for Partial Summary Judgment is denied.

### FACTUAL BACKGROUND

"The facts supported by evidence, [viewed] in the light most favorable to [Defendants]" as the party opposing partial summary judgment, are as follows.[3] *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 662 (10th Cir.2010). Plaintiff KC was committed to the Los Lunas Hospital and Training School and the Fort Stanton Hospital and Training School (collectively, the "Training School")—which at the time of the events giving rise to Plaintiffs' claims were State of New Mexico institutions operated by the New Mexico Department of Health ("DOH") that housed people with developmental disabilities—for an indefinite period on June 8, 1970, at the age of ten, when a judicial determination was made that KC "is mentally defective, and because of said illness is in need of care, custody or treatment in a mental hospital."

1. "Individual Defendants" refers to Defendants Beth Schaefer, Dan Sandoval, Roger Adams, and Joseph Mateju (referred to in Section I as " Defendants").

2. "Department of Health Defendants" refers to the New Mexico Department of Health, the Los Lunas Center for Persons with Developmental Disabilities, and Retta Ward in her official capacity as Secretary of the New Mexico Department of Health (referred to in Section II as "Defendants").

3. A careful reading of Plaintiffs' Statement of Undisputed Material Facts and Plaintiffs' Reply makes clear that in many instances Plaintiffs offer supplemental facts (including facts that do not "refer with particularity to those portions of the record upon which the movant relies," D.N.M.L.R.-Civ. 56.1(b)), characterizations of the facts presented in Defendants' Response, and conclusions that they seek the Court to draw from the facts. To the extent that there is a genuine dispute as to material facts, the Court has construed those facts in the light most favorable to Defendants. The Court has included in its statement of facts the supplemental facts presented by Plaintiffs, to the extent those facts are relevant and referring to the record in accordance with local rules.

[Plaintiffs' Exhibit 1(B) ]. KC was a continuous physical resident of the Training School from approximately February 12, 1970, to August 1974, when she was placed on "AC status" (i.e. aftercare) with Clovis Rehabilitation, a predecessor of the privately-run Eastern New Mexico Mental Retardation Services ("ENMRSH"). [Plaintiffs' Exhibit 2(A) ]. KC was subsequently transferred several times back to the Training School and then again placed on aftercare status. *Id.* KC's final placement on aftercare occurred on March 28, 1977. *Id.* On March 23, 1979, while KC was on aftercare status at ENMRSH, Defendants discharged KC from state custody. *Id.* There is nothing in the record indicating that either KC or any surrogate decision-maker was notified of the discharge, [Plaintiffs' Exhibit 2(A), 2(B) ], and it is undisputed that there is no record of a court order discharging KC. [Plaintiffs' Statement of Undisputed Material Facts (referred to herein as "Plaintiffs' SOF") at 85; Defendants' Response at 85].

Plaintiff JL was committed to DOH custody for an indefinite period on May 4, 1967, at the age of eight. [Plaintiffs' Exhibit 4(A) ]. DOH subsequently petitioned to commit JL to the Training School. *Id.* JL was found to be "incapable of managing herself and her affairs" and was committed to the Training School on June 27, 1969. [Plaintiffs' Exhibit 4(B) ]. While involuntarily committed, JL was placed in a "foster home" for three years, from 1970 to 1973. [Plaintiffs' Exhibit 5(A) ]. JL went back and forth between the Training School and aftercare a few times until she was discharged, while on aftercare, on March 23, 1979. *Id.* On March 23, 1979, with no record of notifying JL or any surrogate-decision maker, Defendants discharged JL from state custody by adding a note to the file and, on May 11, 1979, writing District Judge Harvey W. Fort and informing him that "As [JL is] no longer receiving services, [she has] been

discharged. This is in keeping with the Mental Health and Developmental Disabilities Code." [Plaintiffs' Exhibit 5(A), (B), (C); Defendants' Response at 12]. It is undisputed that there is no record of a court order discharging JL. [Plaintiffs' SOF at 85; Defendants' Response at 85].

A total of 66 residents of the Training School were discharged on the same day as Plaintiffs, March 23, 1979. [Plaintiffs' Exhibit 16; Defendants' Response at 84]. Neither party has presented any evidence regarding how Defendants reached decisions on Plaintiffs' discharges specifically, [Defendants' Response at 86], but the following facts are undisputed as to how Defendants handled Training School residents who were on aftercare, in general, in the late 1970s.

At some point in the 1960s, perhaps motivated by a growing national trend to de-institutionalize those individuals who were capable of having greater independence, [Defendants' Exhibit A], administrators at the Training School began to send higher functioning residents to aftercare, continuing this practice through the 1970s. Defendants acknowledge that "[i]n order to accommodate the waiting list [to be admitted to the Training School] and to admit the more severely challenged individuals, the Training School felt it was necessary to do as much as possible to de-institutionalize people who were able to move out of the facility and live in a community setting." [Defendants' Additional Statement of Facts (referred to herein as "Defendants' SOF") at H (citing Defendants' Exhibit C) ]. Defendants had a "rigorous and detailed" evaluation system for deciding whether to place a resident on aftercare, in which a variety of mental health professionals weighed in, [Defendants' SOF at J, K (citing Defendants' Exhibit C) ], and provided detailed person-

alized life plans to individuals being sent to aftercare. *Id.*

While on aftercare, although Defendants dispute whether residents were entitled to the exact same level of support from DOH as physical residents of the Training School, it is undisputed that aftercare residents remained the responsibility of the Training School. [Plaintiffs' SOF at 23–24; Defendants' Response at 58]. Defendants claim that DOH had a system in place for monitoring aftercare placements. However, there is no record of any follow-up with JL while on aftercare. KC's file notes only one follow-up visit, on April 12, 1978, when social worker Lillian Herron noted in the file that KC was now living on her own in an apartment, and said she was "much happier" residing on her own. [Plaintiffs' Exhibit 3(I)]. The report also states that "Clovis rehab" was the "payee" for KC's SSI benefits and that KC was employed at the "Work Activity Center." *Id.* Finally, Ms. Herron writes, "we will ask recommendations from SCAR for Discharge—as she has functioned adequately in Clovis since 8–19–74." *Id.* Despite Plaintiffs' assertions, [Plaintiffs' SOF at 79], there is no record of SCAR (the Screening Committee on Admissions Release, described below) considering this recommendation. *See* Plaintiffs' Exhibit 2(A).

Defendants acknowledge that "[a]s the number of people on aftercare status grew and the number of social workers that [the Training School] had did not grow, it became increasingly burdensome to be able to maintain the level of contact that [the Training School] wanted to maintain." [Defendants' Response at 42 (quoting

Plaintiffs' Exhibit 7)]. Plaintiffs assert that "visiting KC or JL would have required a social worker ·to travel from Los Lunas to Clovis, a four hour [drive] each way, making Defendants' position entirely implausible that on several occasions and with regard to two clients, social workers spent all that time going to Clovis, yet failed to even note the trips in either client's file." [Doc. 399 at 9, n.2].

With respect to discharge from state custody, while Defendants dispute the specifics of which individuals may have had ultimate authority to discharge residents, it is undisputed that the authority to discharge was shared by the hospital evaluation board and the Screening Committee on Admissions Release, or "SCAR committee." [Plaintiffs' SOF at 17; Defendants' Response at 17]. The SCAR committee was made up of numerous individuals, including physicians, psychologists, the assistant administrator, the social services department head, the director of residential services, the director of training, and the director of education. [Defendants' Response at 17 (citing Plaintiffs' Exhibit 8, 10)]. Discharge was determined through the advice and recommendation of the committee, with the approval of the Training School administrator. *Id.* (citing Plaintiffs' Exhibit 10).[4] Apparently, once the Training School approved discharge, it would then request discharge from local district attorneys by providing a summary of how the individual had progressed and a statement of why DOH was requesting discharge. [Plaintiffs' SOF at 69].

On July 1, 1977, the New Mexico legislature amended the Mental Health and Developmental Disabilities Code[5] in order to

---

**4.** Defendant Mateju was the Training School administrator from 1969 or 1970 until April of 1985. [Plaintiffs' Exhibit 10]. Defendant Adams was the assistant administrator at the Training School and chaired the SCAR committee. [Plaintiffs' Exhibit 7, 10]. Defendant

Sandoval was not a voting member of SCAR. [Plaintiffs' Exhibit 8].

**5.** The pre-existing code is referred to herein as "the 1953 Code," and the amended code is referred to herein as "the 1977 Code."

prohibit involuntary commitments of longer than six months. N.M. Stat. Ann. § 43-1-13 (1977). The General Counsel's Office of DOH, including Defendant Attorney Schaefer, formed the legal opinion that the legislative amendments terminated by operation of law all pre-existing commitment orders that were for an indefinite period, and required all current residents of the Training School to seek orders of recommitment in order to remain at the Training School. [Defendants' SOF at CC (citing Defendants' Exhibit B)]. Defendant Schaefer also advised that Training School residents should have guardians appointed to them. [Defendants' SOF at DD (citing Defendants' Exhibit B)].

However, some time later, Defendant Schaefer discovered that the Department had not yet assessed the validity of the indefinite commitment orders for residents on aftercare, who had been residing in third-party settings since before July 1, 1977. [Defendants' SOF at FF (citing Defendants' Exhibit B)]. Defendant Schaefer consulted with colleagues in the General Counsel's office, including General Counsel Leslie D. Ringer, and with Training School administrators, [Defendants' SOF at RR (citing Defendants' Exhibit B)], and formed the legal opinion that the aftercare program was not permissible under the 1977 Code and that all residents on aftercare at the time of the legislative amendment were discharged by operation of law. [Defendants' Response at 56 (citing Plaintiffs' Exhibit 11); Defendants' SOF at II, KK, MM (citing Defendants' Exhibit B)]. Defendant Schaefer also formed the legal opinion that residents on aftercare were not eligible to renew an aftercare commitment. [Defendants' SOF at JJ (citing Defendants' Exhibit B)].

Defendant Schaefer instructed Training School administrators on the legal status of individuals on aftercare, but the parties dispute what advice she gave to Training School administrators regarding procedures for discharge. Plaintiffs seek to show that Schaefer advised that it was not necessary to inform the court or the residents, or any surrogate decision-makers, of these discharges because the discharges had already occurred by operation of law. [Plaintiffs' SOF at 60–62]. Defendants point out Schaefer's testimony that she advised Training School administrators that residents on aftercare, having already been discharged by operation of law, should be either evaluated to "determine whether they should be committed to the [Training School] institution, in which case they should start a commitment procedure, or if they should be discharged from the institution, in which case they should be discharged, there should be a formal— some sort of notation." [Defendants' Response at 60 (citing Plaintiffs' Exhibit 11)]. Furthermore, Defendants point out that Schaefer did not testify about whether individuals on aftercare were entitled to notice and an opportunity to be heard before discharge, *id.* at 61, and that Schaefer testified that she was not involved in discharge planning, since the 1977 legislation did not address discharge procedures. *Id.* at 62; [Defendants' SOF at EE (citing Defendants' Exhibit B)]. It therefore remains disputed whether Schaefer advised the Training School that it did not need to notify Plaintiffs of their discharge. What is undisputed is that when Training School administrators asked how to record the discharge, Defendant Schaefer instructed the Training School to put a "note in the file" recording the date of discharge. [Defendants' Response at 60].

Aside from the social worker's note in 1978 that KC was receiving SSI, neither party has presented facts regarding benefits to which KC or JL was entitled, let alone facts concerning whether either Plaintiff received her benefits during aftercare and/or after discharge. Nevertheless,

it is undisputed that, while on aftercare, monies for SSA, SSI and other kinds of benefits generally went to the Training School, whose trust fund officer would transfer the funds "to the community caregiver and the individual" for the individual's benefit. [Defendants' SOF at R, S]. Defendants acknowledge that "[t]here may have been times when the community-based caregiver was appointed to be the personal representative of the benefit payments but it is not clear as to what protocols were followed for transferring those public benefits or for appointing personal representatives." [Defendants SOF at X (citing Defendants' Exhibit C)]. However, Defendants assert that the Training School "had no knowledge in the 1970s, or at any time, that ENMRSH did not use government benefits checks for the care of individuals who were entitled to those benefits, and the Training School had no knowledge that ENMRSH intended to keep those benefits for themselves and not use them for the care of their clients." [Defendants' Facts at TT (citing Defendants' Exhibit D)].

### PROCEDURAL BACKGROUND

Plaintiffs filed their First Amended Complaint, [Doc. 102], on June 11, 2013. Plaintiffs' 42 U.S.C. Section 1983 claims for violation of Plaintiffs' Fourteenth Amendment rights to procedural due process, id. at 372–87, and Plaintiffs' requests for declaratory and injunctive relief, id. at 521–31, arise out of Defendants' alleged unilateral decisions (1) temporarily to transfer Plaintiffs from the Training School to ENMRSH, through the "aftercare" program, and (2) permanently to dis-

charge Plaintiffs from the Training School while on aftercare at ENMRSH. Plaintiffs allege that Defendants effectuated the aftercare placements without notice to Plaintiffs, without obtaining informed consent, and without an opportunity to be heard in judicial process. Plaintiffs further allege that Defendants discharged Plaintiffs from the Training School without informing them of their discharges or of Defendants purported severance of the State's custodial relationship with Plaintiffs.

Plaintiffs filed their Motion for Partial Summary Judgment Against the Individual DOH Defendants on Count I (Fourteenth Amendment Procedural Due Process Clause) and against the DOH Defendants on Counts XVI and XVII, [Doc. 211], on December 16, 2013. On February 4, 2014, pursuant to the parties' agreement, the Court entered a stay of all discovery pending the Court's resolution of the issue of qualified immunity. [Doc. 234]. On March 21, 2014, the DOH Defendants filed a Rule 56(d) Motion asking the Court to grant them 75 days after the stay of discovery is lifted to respond to Plaintiffs' motion for partial summary judgment. [Doc. 249]. On September 29, 2015, the Court granted Defendants' Rule 56(d) Motion. [Doc. 376; 406].

On December 14, 2015, seventy-five days after the Court issued its opinion and order deciding Defendants' Motion to Dismiss Plaintiffs' Procedural Due Process Claims on the Basis of Qualified Immunity, [Doc. 375], Defendants filed their Response to Plaintiffs' Motion for Partial Summary Judgment. [Doc. 392].[6] On

---

**6.** However, the stay on discovery was not yet lifted. At the time Defendants filed their Response to Plaintiffs Motion for Partial Summary Judgment, the Court had not yet ruled on Defendants' Motion to Dismiss Plaintiffs' Substantive Due Process Claims on the Basis of Qualified Immunity. [Doc. 214]. Further-

more, after the Court issued its decision on the qualified immunity issue as applied to Plaintiffs' procedural due process claims, Plaintiffs filed a Motion to Lift Stay on Discovery, which Magistrate Judge Garza denied on December 23, 2015. [Doc. 394].

January 20, 2016, the Court granted Plaintiffs' Motion for Extension of Time to File Reply. [Doc. 397]. Plaintiffs' Reply was timely filed on January 27, 2016. [Doc. 399].

### STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Jones v. Kodak Med. Assistance Plan,* 169 F.3d 1287, 1290–91 (10th Cir.1999). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. 2505.

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab.,* 992 F.2d 1033, 1036 (10th Cir.1993) (citations omitted). In the Tenth Circuit, "the moving party carries the burden of showing *beyond a reasonable doubt* that it is entitled to summary judgment." *Trainor v. Apollo Metal Specialties, Inc.,* 318 F.3d 976, 979 (10th Cir.2002) (quoting *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991) (emphasis added). In particular, if the moving party bears the burden of proof at trial, "a more stringent summary judgment standard applies." *Pelt v. Utah,* 539 F.3d 1271, 1289 (10th Cir.2008). A plaintiff moving for summary judgment "must establish, as a matter of law, all essential elements of the issue before [the defendant] can be obligated to bring forward any specific facts alleged to rebut the mov-

ant's case." *Id.* (internal citations omitted).

Once the plaintiff, as the moving party, meets its initial burden of establishing all essential elements of its claims, the defendant, as the nonmoving party, must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990) (citation omitted). The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo v. Neighborhood Health Ctrs., Inc.,* 847 F.2d 642, 649 (10th Cir.1988), but rather must "by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citation omitted).

Upon a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.,* 985 F.Supp. 1277, 1281 (D.Kan.1997), *aff'd,* 162 F.3d 1173 (10th Cir.1998).

### DISCUSSION

Plaintiffs move for partial summary judgment on the procedural due process claims in Count I and on Counts XVI and XVII. First, with respect to their procedural due process claims in Count I, Plaintiffs have not submitted any evidence showing that Plaintiffs KC and JL in fact experienced deprivations of protected interests. Because Plaintiffs have not met their initial burden of proving beyond a reasonable doubt the essential elements of their procedural due process claims, sum-

mary judgment is denied. *Trainor*, 318 F.3d at 979; *Pelt*, 539 F.3d at 1289.

Next, with respect to Counts XVI and XVII, Plaintiffs argue that because the 1977 Code did not terminate Plaintiffs' commitments, and because no court ever terminated Plaintiffs' commitments, Plaintiffs remain in the legal custody of the State and are entitled to state protections. [Doc. 399 at 1–2]. As this Court has already held, Plaintiffs are no longer in state custody. [Doc. 375 at 36–37]. Because Plaintiffs were not in the State's legal custody after March 23, 1979, Plaintiffs cannot establish the essential elements of their requests for declaratory or injunctive relief. Further, as set forth herein, Plaintiffs have not submitted evidence establishing the remaining essential elements of these claims.

## I. Motion for Partial Summary Judgment Against Individual Defendants on Fourteenth Amendment Procedural Due Process Claims

In its Memorandum Opinion and Order dated September 30, 2015, the Court granted in part and denied in part Defendants' Motion to Dismiss Plaintiffs' Procedural Due Process Claims on the Basis of Qualified Immunity. [Doc. 375]. Plaintiffs' surviving procedural due process claims are premised upon the following:

(1) *Post-discharge transfers* to third-party settings depriving Plaintiffs of a property interest in benefits under the 1953 Developmental Disabilities Code;

(2) *Post-discharge transfers* to third-party settings depriving Plaintiffs of a liberty interest in freedom from undue restraint;

(3) *Aftercare transfers* to third-party settings depriving Plaintiffs of liberty interests in personal security and safe conditions of confinement and in minimally adequate food, shelter, and medical care; and

(4) *Post-discharge transfers* to third-party settings depriving Plaintiffs of a protected property interest in SSI benefits and Medicaid payments.

*Id.* at 80. Accordingly, the Court now reviews Plaintiffs' Motion for Partial Summary Judgment as applied to each of the above four claims.[7]

In their moving brief, Plaintiffs make arguments regarding their substantive due process claims. [Doc. 211 at 34–42]. In a separate Opinion entered concurrently, the Court addresses these claims and grants in its entirety Defendants' Motion to Dismiss Plaintiffs' Substantive Due Process Claims on the Basis of Qualified Immunity. Accordingly, the Court will not consider any substantive due process arguments in support of the present Motion for Partial Summary Judgment on Plaintiffs' procedural due process claims.

■ Finally, the Court notes that in their reply brief, Plaintiffs argue that the 1977 Code did not terminate Plaintiffs' pre-existing commitment orders, and that because Defendants were mistaken in their interpretation of the legislative amendments, Plaintiffs' discharges necessarily deprived them of their protected interests without due process of law. [Doc. 399 at 1]. The Court rejects this argument. As this Court previously held, a state statute does not define the scope of constitutional rights. Accordingly, Plaintiffs cannot establish a procedural due process violation simply by demonstrating that Defendants'

---

**7.** The Court notes that Plaintiffs JL and KC were discharged while already residing on aftercare and were not transferred by DOH to ENMRSH after their discharge. [Doc. 392 at 54; Doc. 399 at 22]. Accordingly, the phrasing of the above categories is amended below to reflect these facts.

discharges were illegal under state law as set forth in the 1953 Code. [Doc. 375 at 23 (citing *Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 591 n. 2 (10th Cir.1999)) ]. In order to warrant summary judgment on each of the four remaining procedural due process claims, Plaintiffs must present evidence establishing the essential elements of each claim beyond a reasonable doubt. *Pelt*, 539 F.3d at 1289; *Trainor*, 318 F.3d 979. As explained below, because Plaintiffs have not met their initial burden on any of the four remaining claims, summary judgment must be denied.

### A. *Whether Discharge Deprived Plaintiffs of a Property Interest in Benefits Under the 1953 Code*

■ Plaintiffs argue that their discharge on March 23, 1979, deprived them of their protected property interests in the benefits that arise from being in involuntary commitment, and that these property rights were deprived without due process because Defendants failed to notify Plaintiffs of their discharge. [Doc. 211 at 30; Doc. 399 at 13–19]. In declining to dismiss this claim on Defendants' Motion to Dismiss, this Court found that Plaintiffs adequately alleged clearly established property rights to "state-funded care, custody, employment, education from certified teachers, and training" which "created a claim of entitlement" such that "Plaintiffs' expectations, upon their commitments ... were not unilateral and they did not constitute a mere abstract need or desire." [Doc. 375 at 21].

Defendants argue that "Plaintiffs have not put forth any evidence to show that, as a matter of law, any state-funded benefits of care, custody, employment, education or training that they were receiving prior to discharge from the Training School were terminated, or reduced, or changed in any way." [Doc. 392. at 47]. Defendants therefore argue that the issue of whether Plaintiffs experienced a deprivation of their property rights, an essential element of Plaintiffs' procedural due process claim, has not been proven. *Id.* at 39–40.

In their reply, Plaintiffs mistakenly argue that whether Plaintiffs' property interests were impacted by the discharge is not a material factual dispute, but rather is only a damages issue. [Doc. 399 at 17–18 (citing Doc. 211 at 42) ].[8] In taking this position, Plaintiffs fundamentally misunderstand their burden. Whether Plaintiffs were deprived of these property interests is not only a dispute of material fact but also, more importantly, an essential element of Plaintiffs' procedural due process claim. *See Stears v. Sheridan County Mem'l Hosp. Bd. of Trs.*, 491 F.3d 1160, 1162 (10th Cir.2007) ("A successful procedural due process claim requires a plaintiff to show ... the deprivation of a liberty or property interest"). Plaintiffs must prove the essential elements of their claim beyond a reasonable doubt in order to establish that summary judgment in their favor is warranted. *Trainor*, 318 F.3d at 979; *Pelt*, 539 F.3d at 1289. Further, Plaintiffs cannot rely on mere allegations of deprivation of protected property interests to support their request for a finding of liability against Defendants on summary judgment. *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505. Because Plaintiffs have not estab-

---

8. In their Reply Brief, Plaintiffs admit that they have not met their initial burden by telling the Court the following: "While Plaintiffs are prepared to show at a hearing on damages that KC and JL did not, in fact, receive benefits ... they have not shown as a matter of undisputed fact that this is so. However, this disputed fact is not material to Plaintiffs' Motion ... Plaintiffs are not seeking summary judgment regarding the amount of their damages—having explicitly requested an evidentiary hearing to establish their losses." [Doc. 399 at 17–18].

lished an essential element of their claim, namely, that Plaintiffs were deprived of their protected property interests, Plaintiffs' motion for summary judgment on their claim that discharge from state custody deprived them of a protected property interest under the 1953 Code is denied.

Defendants cite *Atkins v. Parker,* 472 U.S. 115, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985), in support of their argument that even if Plaintiffs suffered a deprivation of benefits under the 1953 Code, Plaintiffs were not entitled to notice of their discharge because it occurred through operation of law when the New Mexico legislature passed the 1977 Code. [Doc. 392 at 51–53]. The Court rejects this argument. In *Atkins,* the Court held that legislative changes to the income requirements for receiving food stamps did not deprive recipients of procedural due process because "the participants in the food-stamp program had no greater right to advance notice of the legislative change—in this case, the decision to change the earned-income disregard level—than did any other voters." *Atkins,* 472 U.S. at 130, 105 S.Ct. 2520. However, unlike the present case where there is no record of Plaintiffs receiving notice of their discharge, "every person affected by the change [to food stamp eligibility] was given individual notice of the substance of the amendment." *Id.* at 131, 105 S.Ct. 2520. Furthermore, whereas food stamp recipients could not avoid the change in eligibility requirements even if given an opportunity, anyone with an indefinite involuntary commitment order after July 1, 1977 could seek recommitment, if informed of the need to do so. In sum, had Plaintiffs proven deprivation of their protected property interests, Defendants would not be able to avoid liability under *Atkins* because Plaintiffs could have attempted to preserve their protected property rights by seeking recommitment to the Training School, had they known of the need to do so.

### B. *Whether Discharge Deprived Plaintiffs of a Liberty Interest in Freedom from Undue Restraint*

This Court previously held that Defendants' discharge of Plaintiffs from state custody did not implicate any protected liberty interests. [Doc. 375 at 14–17]. The Court noted one exception to its holding, finding that Defendants' post-discharge physical transfers of a plaintiff from Los Lunas to the ENMRSH facility in Clovis did in fact implicate a constitutionally protected liberty interest in freedom from undue restraint. *Id.* at 30–32.

It is undisputed that, as part of the aftercare program, KC and JL were transferred to ENMRSH before their discharges, and that both Plaintiffs were discharged from involuntary commitment, while on aftercare at ENMRSH, on March 23, 1979. [Doc. 392 at 54; Doc. 399 at 22]. It is therefore undisputed that Defendants never transferred or transported Plaintiffs KC or JL to Clovis or anywhere else after their discharge. Accordingly, Defendants argue that Plaintiffs KC and JL cannot benefit from the limited exception to the Court's holding that Defendants' discharge of Plaintiffs from state custody did not implicate any protected liberty interests.

■ Plaintiffs argue that because Defendants failed to notify them of their discharge, Plaintiffs were not ever aware that they could choose to live elsewhere and were thereby deprived "of their liberty interest in living where they chose to live." [Doc. 399 at 22–23]. The Court has reviewed its prior decision and, taking relevant law and facts into consideration, now finds that Plaintiffs sufficiently alleged that because Plaintiffs were never notified of their discharge from the Training School, they were deprived of their protected liberty interest in freedom from undue restraint. In so holding, the Court

now takes the opportunity to amend and clarify its prior ruling.

In holding that "Plaintiffs have failed to allege that their discharges from the Training School deprived them of any constitutionally-protected liberty interest," [Doc. 375 at 17], the Court did not consider freedom from undue restraint explicitly. The Court looked to the "nature of the interests at stake," *id.* at 14 (citing *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 570–71, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)), and found that the "nature of the interests alleged" included "interests in remaining committed to state custody, being entitled to state protection, having the state provide food, shelter, medical care, and habilitation services, being placed in the least restrictive setting, and receiving the opportunity to associate with family and peers." [Doc. 375 at 17]. The Court granted dismissal of procedural due process claims arising from deprivation of these interests, reasoning that these interests were the "equivalent of a claim of entitlement to receive substantive services from the state." *Id.* The Court now amends this ruling, which should not have included freedom from undue restraint as an "entitlement to receive substantive services from the state."

In finding that Defendants' post-discharge transfer of plaintiffs deprived them of their protected liberty interest in freedom from undue restraint, the Court observed that after discharge from state custody, Defendants "no longer had any justification for restraining Plaintiffs' freedom." *Id.* at 31. In a footnote, the Court further noted that Defendants' failure to give Plaintiffs notice of their discharge from state custody "is as if Defendants effectuated a *de facto* re-commitment of Plaintiffs to state custody .... [because] on the facts alleged Plaintiffs had no way of discerning" that they were now free to live anywhere of their choosing. *Id.* at 32,

n.10. As a result, although Defendants never transferred or transported JL or KC to ENMRSH or any other third-party facility after their discharge on March 23, 1979, Defendants' alleged failure to notify Plaintiffs of their discharge meant that Plaintiffs continued to reside at ENMRSH, allegedly with the understanding that they remained in involuntary commitment and were unable to leave. The Court therefore amends its prior ruling, [Doc. 375 at 14–17], and now finds that Defendants' failure to notify Plaintiffs of their discharges sufficiently alleges that, once discharged, Plaintiffs were deprived of their protected liberty interest in freedom from undue restraint.

■ Having found that Plaintiffs sufficiently alleged that their discharges without notice deprived them of their protected liberty interest in freedom from undue restraint, the Court next considers whether Plaintiffs, as the moving party, have proven "beyond a reasonable doubt" that they are entitled to judgment as a matter of law. *Trainor,* 318 F.3d at 979. If Plaintiffs have not met their initial burden, Defendants are not obligated to produce any evidence in order to defeat summary judgment. *Pelt,* 539 F.3d at 1289. The only relevant fact before the Court is that there is no apparent record that either JL or KC was ever notified of her discharge. However, Plaintiffs have not submitted any evidence to confirm that they were in fact unaware of their discharge and/or unaware that they could choose to live elsewhere. [Plaintiffs' SOF at 85; Defendants' Response at 85]. Because this Court must view all facts in the light most favorable to Defendants, the Court cannot connect the dots on Plaintiffs' behalf and infer solely from the present record's lack of notice that Plaintiffs were, beyond a reasonable doubt, not notified of their discharge and/or unaware that they could live else-

where. Affidavits from Plaintiffs could have potentially satisfied Plaintiffs' burden, but none were submitted. Accordingly, because Plaintiffs have not met their initial burden of establishing beyond a reasonable doubt that they were unaware of their discharges, Plaintiffs are not entitled to summary judgment on their claim that their discharges deprived them of a protected liberty interest in freedom from undue restraint.

### C. Whether Aftercare Transfers Deprived Plaintiffs of Liberty Interests in Personal Security and Safe Conditions of Confinement and in Minimally Adequate Food, Shelter, and Medical Care

This Court previously held that, "[a]t the time Defendants placed Plaintiffs on aftercare, Plaintiffs were still remanded to the custody of the Training School by court order and Defendants had not reported, either lawfully or unlawfully, to discharge Plaintiffs from that custody. Thus, because Plaintiffs were still institutionalized—and wholly dependent on the State—Defendants had a continuing duty to protect Plaintiffs and to provide Plaintiffs with food, shelter, clothing, and medical care." [Doc. 375 at 35].

On summary judgment, Defendants argue that Plaintiffs have not met their initial burden of presenting evidence of their alleged deprivation of liberty interests while on aftercare. In particular, Defendants argue that Plaintiffs have failed "to show that at any time while either JL or KC were placed on aftercare with ENMRSH and prior to discharge from the rolls of the Training School, that either JL or KC ever suffered any deprivation of rights." [Doc. 392 at 40].

Plaintiffs mistakenly argue that they are not obligated to show the deprivations that Plaintiffs experienced until litigating damages. [Doc. 399 at 17–18]. The Court rejects this argument and notes that neither Plaintiffs' Motion nor Plaintiffs' Reply sets forth any evidence showing that Plaintiffs JL or KC specifically experienced problematic conditions while at ENMRSH on aftercare. Again, because Plaintiffs have not met their initial burden of establishing Plaintiffs' deprivation of their protected liberty interests on aftercare, summary judgment in favor of their claim that aftercare transfers deprived them of protected liberty interests is denied.

In fact, the only evidence in the record that speaks directly to Plaintiffs' experience on aftercare is cited by Defendants in order to show that, even if Plaintiffs had presented evidence of violations of Plaintiffs' protected liberty interests, there are disputed issues of material fact as to whether Defendants' actions deprived Plaintiffs of any protected liberty interests. [Doc. 392 at 41–42 (citing Plaintiffs' Exhibit 3(I) which shows that on April 12, 1978, Training School social worker Lillian Herron reported that KC had been placed in an apartment, was then "living alone, having company with her boyfriend and planning to get married soon as possible [and] according to [KC] she is much happier. She works at the Work Activity Center and does not attend school.") ]. Defendants further dispute the alleged poor quality of Plaintiffs' lives on aftercare by citing evidence showing that DOH had a detailed process for placing individuals on aftercare, "whereby a committee of teachers, social workers, psychologists, therapists and other Training School staff would consider individuals for aftercare placement and ultimately create a service plan or 'life plan' for aftercare individuals to receive ongoing support in the community, for living arrangements, vocational counseling, medical and psychological care as needed, and to have their needs met if therapies or continued education was required." Id. at 41 (citing Defendants' SOF

at J, K, O). Weighing this evidence in the light most favorable to Defendants, without more evidence from Plaintiffs, a reasonable jury could find that Plaintiffs did not experience a deprivation of protected liberty interests while on aftercare. Because there is a genuine dispute of material fact, summary judgment in favor of Plaintiffs' claim that aftercare transfers deprived them of their protected liberty interests is denied.

D. *Whether Discharge Deprived Plaintiffs of a Property Interest in SSI and Medicaid Payments*

■ Defendants argue, once again, that Plaintiffs failed to meet their initial burden under Rule 56 and Tenth Circuit case law to show, beyond a reasonable doubt, that JL and KC were deprived of SSI and Medicaid Payments, having failed to put forth any evidence regarding the post-discharge transfer of benefit checks. [Doc. 392 at 57].

On Reply, Plaintiffs mention for the first time and without any citation to the record that "When KC and JL were removed from the rolls at Los Lunas, control of their SSI benefits was not transferred to them, and they did not receive their monthly stipend. Instead, control of Plaintiffs' SSI benefits was transferred to the new provider." [Doc. 399 at 23]. Plaintiffs therefore argue that Defendants' failure to transfer control directly to Plaintiffs or to their surrogate decision-makers deprived Plaintiffs of their protected property interests, even if ENMRSH "accounted for the funds and used them for Plaintiffs' benefit." *Id.* The Court will not consider this argument for two reasons.

First, Plaintiffs cannot rely on mere allegations, rather than evidence, in order to meet their burden of production under Rule 56. *Pelt,* 539 F.3d at 1289; *Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505 (finding that a nonmovant plaintiff

"must present affirmative evidence in order to properly defeat a [defendant's] properly supported motion for summary judgment"). Because nothing in the record substantiates Plaintiffs' allegations that Defendants transferred control of the trust accounts containing the SSI and Medicaid benefits of JL and KC to ENMRSH, Plaintiffs have not satisfied their initial burden of proving an essential element of their claim, namely, that Plaintiffs were deprived of a protected property interest.

Second, Plaintiffs cannot raise new arguments on Reply if it would prejudice Defendants to not have an opportunity to respond. *Pippin v. Burlington Resources Oil and Gas Co.,* 440 F.3d 1186, 1192 (10th Cir.2006). Because Defendants have not had an opportunity to present contravening evidence in order to dispute Plaintiffs' assertions, even if factually supported, the Court would not consider Plaintiffs' argument.

**II. Motion for Partial Summary Judgment Against DOH Defendants on Requests for Declaratory Judgment and Injunctive Relief**

Plaintiffs seek summary judgment on Counts XVI (requesting a declaratory judgment) and XVII (requesting injunctive relief) against Defendants New Mexico Department of Health, the Los Lunas Center for Persons with Developmental Disabilities, and Retta Ward in her official capacity as Secretary of the New Mexico Department of Health. [Doc. 211 at 42]. Specifically, "Plaintiffs seek a declaration and injunction by the Court that, in the absence of a legally supportable discharge from State custody, Plaintiffs, in fact, remain wards of the State, and that as such, DOH Defendants owe Plaintiffs the continuing responsibility to ensure Plaintiffs' health and safety." *Id.* at 37; [Doc. 399 at

27]. Defendants argue that because the Court has already rejected Plaintiffs' contention that "they remain to this day under continuous, court ordered, involuntary commitments and in the state's custodial care," [Doc. 375 at 36–37], Plaintiffs' requests should be denied. The Court agrees.

 This Court has ruled that Plaintiffs are not currently wards of the State and that, accordingly, Defendants do not owe Plaintiffs a continued responsibility to ensure their health and safety. [Doc. 375 at 36–37]. In a Submission of Supplemental Authority filed on January 7, 2015, Plaintiffs ask the Court to give preclusive effect to rulings in related cases, involving the same defendants, in which the court ruled that the plaintiffs therein remained in state custody and are therefore entitled to substantive due process protections from the state. [Doc. 309 (citing *A.M. v. NMDOH*, 65 F.Supp.3d 1206 (D.N.M. 2014); *J.M. v. NMDOH*, No. CIV 07–0604, Doc. 198). *See also* Doc. 211 at 36–37; Doc. 399 at 1 (citing same) ]. "Non-mutual offensive issue preclusion occurs where a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against a different party." *Fulsom Const. Co. Inc. v. U.S. Fid. & Guar. Co.*, No. 04–6087, 2005 WL 2542860, at *4 (10th Cir. Oct. 12, 2005). The four elements of offensive collateral estoppel are: (i) the issue decided in the prior adjudication was identical with the one presented in the action in question; (ii) there was a final judgment on the merits; (iii) the party against whom estoppel is asserted is a party or in privity with a party to the prior adjudication; and (iv) the issue in the first case was competently, fully, and fairly litigated. *See In re Lombard*, 739 F.2d 499, 502 (10th Cir.1984).

 This Court will not give preclusive effect to the rulings in *A.M.* and *J.M.* because the issue of whether plaintiffs remain in state custody is not identical and depends on the specific facts regarding each plaintiff's interactions with DOH. For example, the facts in *A.M.* are distinguishable from the facts in the present case, as plaintiff A.M. was not discharged from state custody but rather received a recommitment order on October 17, 1979, recommitting her to the Training School for up to six months, and was then placed in a third-party setting on aftercare. *A.M.*, 65 F.Supp.3d at 1217–19. This Court, too, has held that individuals in aftercare "were still institutionalized—and wholly dependent on the State," meaning that the State "had a continuing duty to protect Plaintiffs and to provide Plaintiffs with food, shelter, clothing, and medical care." [Doc. 375 at 35]. This is not the case here, however, as Plaintiffs were discharged on March 23, 1979, and thus this holding is not applicable.

 In addition to the fact that the plaintiff was on aftercare and not discharged, the *A.M.* court noted that A.M.'s third-party caretaker would plant cacti outside the walls to prevent residents from escaping, leading the court to infer that A.M. "was involuntarily committed to state custody even after she was placed at the Homestead House." *A.M. v. NMDOH*, 65 F.Supp.3d 1206, 1257 (2014). Here, Plaintiffs JL and KC have not submitted any evidence entitling them to summary judgment on their claim that despite being discharged, they remained confined by the state. For example, as discussed above, Plaintiffs have not submitted any evidence concerning their quality of life at ENMRSH or whether they were able to leave. Without any evidence allowing the Court to reasonably infer that Plaintiffs were "*de-facto* recommitt[ed] ... to state custody," [Doc. 375 at 32 n.10], the Court must view this lack of evidence in the light

most favorable to Defendants and find that Plaintiffs have failed to show that they remain in state custody. Plaintiffs' motion for summary judgment on Count XVI is denied.[9]

■■■■■ As for Plaintiffs' request for injunctive relief, Defendants argue, and the Court agrees, that Plaintiffs have not met their burden under Rule 56 to produce evidence establishing as a matter of law all essential elements of this claim. In order to obtain injunctive relief, Plaintiffs must demonstrate "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *Attny Gen. of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir.2009) (citations omitted). Plaintiffs' only argument in support of their request for injunctive relief[10] is that Defendants necessarily violated Plaintiffs' substantive due process rights by placing them at ENMRSH. [Doc. 211 at 34–42].

As noted above, in a concurrent opinion, this Court has dismissed Plaintiffs' substantive due process claims on the basis of qualified immunity, rendering Plaintiffs' argument for likelihood of success on the merits moot. Furthermore, Plaintiffs have not made any argument or put forth any evidence showing that JL and KC individually will suffer irreparable harm absent an injunction, that the balance of equities tip in their favor, or that the injunction is in the public interest, stating only that "Plaintiffs retain their Fourteenth Amendment liberty interests, even though the DOH Defendants placed them involuntarily at the ENMRSH program in Clovis." [Doc. 399 at 29–30]. Because Plaintiffs have not established any, let alone all, of the essential elements of their claim requesting injunctive relief, Plaintiffs' motion for summary judgment on Count XVII must be denied.

## CONCLUSION

IT THEREFORE IS ORDERED that Plaintiffs JL and KC's Motion for Partial

9. The record in this case is also distinguishable from *J.M.*, where both plaintiffs were discharged by court order. *J.M.*, No. CIV 07–0604, Doc. 198 at 2–3. There is no record of a court order discharging KC or JL. Furthermore, the opinion that Plaintiffs cite in their Submission of Supplemental Authority pertains to plaintiffs' substantive due process rights and finds that plaintiffs' involuntary commitment to state custody entitled them to substantive due process protection. *Id.* at 5. This Court respectfully distinguishes its opinion from the *J.M.* court in its concurrently filed Opinion dismissing Plaintiffs' substantive due process claims on the basis of qualified immunity.

10. On Reply, Plaintiffs for the first time seek to draw an analogy between the 1977 amendments to the Mental Health Code, and 1997 changes to the New Mexico Abuse and Neglect Act. [Doc. 399 at 27–29]. The Court declines to consider this argument because

Plaintiffs raise it for the first time in their reply. *See Pippin*, 440 F.3d at 1192. The sole argument Plaintiffs raise in their opening memorandum is that Plaintiffs remain in state custody, and retain their substantive due process rights, and are therefore entitled to protection and benefits from the State. [Doc. 211 at 34–42]. Defendants thus, in their opposition, respond only to Plaintiffs' contention that they remain in state custody. [Doc. 392 at 59–60]. Plaintiffs therefore failed to place Defendants on notice that they were moving for summary judgment on the grounds that the State's treatment of foster children at the time of the 1997 amendments to the Abuse and Neglect Act concedes liability for not treating Plaintiffs similarly at the time the Mental Health Code was amended in 1977. Because entertaining an argument that Plaintiffs raised for the first time in their reply would prejudice Defendants, the Court declines to consider the argument.

Summary Judgment Against Individual Defendants on Count I (Fourteenth Amendment Procedural Due Process Clause) and Against DOH Defendants on Counts XVI and XVII, and Supporting Memorandum, [Doc. 211], is **DENIED.**